## MONARCH MARKING SYSTEM CO. v. A. KIMBALL CO.
### No. 5247.

District Court, E. D. New York.
Dec. 14, 1931.

Nathan, Bowman & Helferich, of New York City (Border Bowman, of New York City, and William R. Wood, of Cincinnati, Ohio, of counsel), for plaintiff.

Emery, Booth, Varney & Whittemore, of New York City (Lucius E. Varney and Nichol M. Sandoe, both of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is a suit brought by the plaintiff to recover damages for and to restrain by injunction the continued alleged infringement of patent No. 1,130,614, issued to Frederick Kohnle, assignor, by mesne assignments, to the Monarch Tag Company, for price tag, and dated March 2, 1915; patent No. 1,197,037, issued to Frederick Kohnle, assignor, by mesne assignments, to the Monarch Tag Company, for printing and severing device for ticketing machines, dated September 5, 1916; and patent No. 1,327,241, issued to Frederick Kohnle, assignor to the Monarch Tag Company, for tag feeding and printing machine, dated January 6, 1920.

The defendant interposed the twofold defenses of invalidity and noninfringement.

No anticipation of either of the said patents in suit was shown, and the prior art did not disclose either tag strips or complimentary marking machines suitable for performing the useful service of plaintiff's or defendant's strip and marking machines; therefore no extended discussion of the prior art is necessary, although in one or another of them are shown feeding devices, printing devices, and severing devices used in combination different from those of the patents in suit, and for different purposes.

The art prior to the inventions of the patents in suit, in its then most advanced stage, was shown in automatic pin ticketing machines of the general order of the machines of the Davis patents, Nos. 864,157 and 1,156,672, the Kimball patent, No. 457,782, and the Kohnle patent, No. 1,029,695, which were large, complicated, and expensive, could be operated only by skilled operators, and required constant mechanical supervision.

The problem was presented by these machines, and their teachings did not aid in its solution, which was found in the pat-

ents in suit, the tag strips and machines of which are applied and operated generally in large department stores by unskilled labor.

The Kimball patent, No. 457,782, does not show strips comprising individual tags separated by divisional slots and prestapled, and does not resemble the defendant's alleged infringing device or the devices of the patents in suit.

The Murphy patent, No. 764,615, is for an addressing machine, and discloses the general idea of a machine for printing and addressing convential shipping cards, having tie-on eyelets.

The specification in describing the tags says: "A continuous strip, each tag being separated from the adjacent tag by slits which extend transversely of the strip to points near the extreme ends of the tags."

This patent taught nothing which aided in solving the problem which confronted Kohnle. Its claims are directed to printing and indexing mechanisms, and there is no suggestion even of the Kohnle idea of furnishing the tags in gang strips, with preformed divisional slots, and with a line of perpendicular projecting prongs close to the margin of the strip.

The Kimsey patent, No. 736,406, is for a machine for stringing tags, and its claims are directed to combinations of various feeding and severing mechanisms, with a stapling mechanism.

No marking mechanism is disclosed.

The machine was designed for manufacturing price tags, to be hand-marked, and provided with special mechanism for feeding the tags in a continuous strip to the stapling machine, and for severing a tag from the strip simultaneously with the attachment of the tag to the string or cord.

I find nothing in that patent which taught Kohnle how to solve the problem which confronted him and which he did solve by the patents in suit.

The Ralph patent, No. 487,540, is for a combination ticket, and shows price tags of a peculiar double-ply construction. It shows strips of stapled tags for hand-marking, but the staples are inserted at right angles to the margin of the strip and not parallel thereto, with all the staple prongs in a simple straight line.

The problem that confronted Kohnle was not solved by any assistance which he received from the teaching of the Ralph patent.

The Ralph patent does not disclose or even suggest the invention of the patents in suit.

The invention of the patentee of the patents in suit was appropriated by the defendant, and it cannot relieve itself from the charge of infringement by showing that it has appropriated something from various prior patents which collectively show various orders of tag structures, feeding devices, printing devices, and severing devices, but none of which even suggest, much less show, the invention or combinations of the patents in suit.

It seems clear to me that the combinations of the respective patents in suit show patentable invention.

Defendant's construction cannot, as was attempted by it, be justified, and the patents in suit be demolished piecemeal, by pointing out in a miscellaneous and somewhat nonanalogous prior art, examples of one or another element found in the defendant's device.

As to the tag strip patent No. 1,130,-614, plaintiff bases this suit upon claims 1, 2, and 3, which read as follows:

"1. A new article of manufacture comprising a strip divided into tag lengths by divisional notches laterally extended from one edge of the strip inwardly toward the longitudinal medial line of the strip and in relatively equal spaced parallelism, a staple permanently clenched through each tag length between the notches and serially in longitudinal alinement with the notched margin of the strip with the notches extending beyond the longitudinal line of the staple to provide abutments, whereby the strip may be engaged to be fed in appropriate step intervals.

"2. A new article of manufacture comprising a strip divided into tag lengths by divisional notches in parallelism extended from one edge of the strip toward its medial line, a series of staples secured to the strip in relative longitudinal alinement and in parallelism with the notched marginal edge of the strip, one staple connected to each tag length between the divisional notches having its prongs passed through the tag and offset or shouldered to overlap on the reverse side of the tag and the said notches extending beyond the longitudinal line of staples providing abutments whereby the strip may be engaged to be fed in appropriate step movements.

"3. A new article of manufacture com-

prising a strip divided into tag lengths by divisional apertures in longitudinal alinement at one of its margins, a staple secured to each tag length between the apertures in longitudinal alinement, said apertures each providing a shoulder for engagement by feeding mechanism to internally advance the strip and a pre-severed portion adjacent the staple."

The tag strip of the patent in suit discloses a strip divided into tag lengths by divisional notches extending inward from one edge of the strip, with a line of staples one for each tag, with the staple prongs projecting in a single row close to and parallel with the margin of the strip and at right angles thereto.

The patentee in his specifications said: "It is to be understood that these strips are sold in convenient gang length, say each strip comprising twelve tags, and that when these strips are fed to the machine, the staple prongs are in an upright position when passing under the cutter, and the cutter merely operates to continue the cut from the terminal ends of the divisions 2 across the web of the strip, thus severing one of the units, shown in Fig. 3. The divisional notches 2 are also functional in providing on the strip engaging shoulders or abutments for the feeding mechanism of the machine, enabling the strip to be fed in the appropriate step movements."

In the defendant's tag strip there are two part slots, one partly from the staple edge, and another from the other edge; the two portions being in alignment.

Both in the patent in suit and in defendant's tag strip there are uncut portions between the two edges, and this is necessary in order to maintain a certain stiffness to the gang tag strip, so that it can be advanced without bending and crumbling.

The incisions of the defendant's gang tag strip on both edges do not add any function to, nor subtract any function from, the incisions on one edge of the gang tag strip of the patent in suit, and this finding is supported by the testimony of the defendant's expert.

In both the staples are cleared by part of the slot, and there is enough of the slot, whether it is in one part or two parts, so that the finger of the carriage can engage it. There is no function possible in the tag of the patent in suit that cannot be obtained in the defendant's tag, therefore functionally, and as far as the actual results are concerned, the tag of the defendant is the full equivalent of the tag of the patent in suit.

Defendant denies the right of the plaintiff to extend its single notch claims by the application of the doctrine of equivalents, in such manner as to cover defendant's double notch tag strip, and contends that by consenting to the cancellation of original claim 4, and amending as finally allowed, the patentee definitely limited himself to notches or apertures at one edge or margin; but it does not seem to me that the rule of estoppel would deny the patentee so obvious an equivalent. Southern Textile Machinery Co. v. United Hosiery Mills Corp. (C. C. A.) 33 F.(2d) 862, 865.

The patent discloses, as a new article of manufacture and of commerce, a tag strip formed with divisional slits which define the individual tags of the strip, and a line of staples, one for each tag, with the staple prongs projecting in a single row close to and parallel with the margin of the strip, and at right angles thereto.

This was the novelty and utility which caused the Examiners in Chief on appeal to reverse the Examiner, not whether divisional slots were on one or both margins of the strip.

Defendant cannot escape infringement from the single fact that in its tag another or counterpart series of divisional incisions is formed on the bottom margin of the slot, for the express purpose of partially severing the strip, and to provide feed shoulders or abutments.

No question was raised at any stage in the Patent Office proceedings as to whether there was any patentable distinction between a tag strip formed with divisional cuts on one or both margins.

The original claim 4 which was canceled referred to the slots as on one margin, that is, the stapled margin of the strip, in the following language: "Divisional cuts extending toward the medial line of the strip, staples clenched through the strip between the divisional cuts in marginal alignment with the strip"—and claim 1 of the amendment of March 25, 1913, which was also canceled, called for notches "extended from one edge of the strip toward the medial line." It is therefore obvious that there was no limitation as to the location of the notches by reason of estoppel. R. Hoe & Co. v. Goss Printing Press Co. (C. C. A.) 30 F.(2d) 271, 275.

This is especially true where the location of the notches was not of the essence of the invention and a narrow construction was not required by the references. Magic City Kennel Club v. Smith (D. C.) 38 F.(2d) 170; Kerner Incinerator Co. v. Townsend Estates (C. C. A.) 27 F.(2d) 599; Hildreth v. Mastoras, 257 U. S. 27, 42 S. Ct. 20, 66 L. Ed. 112.

■ The invention of the patent in suit is a marked departure and fills a real need, and has gone into general use, and in such case infringement is not avoided by purely literal departure from the apparent limitation of the claim. Farrington v. Haywood (C. C. A.) 35 F.(2d) 628, 630.

Defendant has omitted no functional element of the claims, it has simply taken the exact elements and put them in a slightly different place, where they perform the identical function.

The tag strip manufactured by the Dennison Manufacturing Company, introduced in evidence by the defendant, represents an abandoned experiment.

A considerable portion of time was given, and the expenditure of a substantial sum of money was made, to build a machine to manufacture the Dennison tag strip, in the year 1904, but they made no impress on the art, and after a few months, in the year 1904, the Dennison Manufacturing Company abandoned the attempt to commercialize these strips.

Defendant's expert gave no evidence on the trial with reference to these strips.

There is a seeming similarity of the Dennison tags to the tags of the patent in suit, but on comparing the two it is apparent that the Dennison tags are entirely unsuited for the work of the tags of the patent in suit, and did not teach the patentee of the patent in suit how to solve the problem which confronted him.

The Dennison tags are prestapled on one margin and divisionally preslotted on the opposite margin, but the staples are not separated one from the other by incisions, and this shows that no knife clearance was required or provided. The staple prongs are bent outwards into the plane of the strip, thus permitting it to lie flat on the table for stamping or writing, and the individual tags are connected in strip form by so slender a strand of paper or cardboard, the incisions nearly severing the strip but not extending into the marginal spaces between the staples, that the strips are incapable of handling without rupture, and of being fed through a machine for making and severing the individual tags.

It is therefore apparent on the face of the Dennison strips that they were intended to be marked by hand and were not intended or adapted for machine service.

The Dennison tag strips did not anticipate the patent in suit.

The patent is valid, and defendant infringed.

■ As to the printing and severing device for ticketing machines, patent No. 1,197,037, plaintiff bases this suit upon claims 2 and 3, which read as follows:

"2. A machine of the character described, combining a support having a work-supporting table, capable of tracking a gang strip of pre-stapled tags divisionally apertured for partial separation in longitudinal alinement with the staple, presenting transverse abutments, time operated feeding devices intervally engaging an aperture to advance the strip, a member mounted to reciprocate upon said support, and a cutter unitarily movable with said member having a cutting edge equal the distance between the inner ends of the apertured portions and the opposite edge of the strip for separating each tag from its strip upon a cutting stroke of said cutter.

"3. A machine of the character described, combining a support having a work supporting table capable of tracking a gang tag strip, the strip divisionally notched from one longitudinal edge to partially separate the tags and providing abutments for feeding mechanism therefor, feeding mechanism for said strip, a movable cutter support and cutter for severing the tags from the strip, said cutter having a cutting edge of a length equal the distance between the apertured portions and the opposite edge of the strip."

This patent was issued on a divisional application, for a tag feeding, severing, and printing machine or unit, filed June 17, 1914, of an original application filed March 11, 1912, which disclosed the combined machine for marking the tags and for stapling them to the merchandise.

The purpose of the machine is set forth in the specification as follows: "The machine of which the invention herein is a component, as set forth in said application, operates upon gangs of pre-stapled tags, so as to feed the same at intervals or step advances toward printing devices for printing the desired tag data thereon; severing

devices for separating the individual units from the gang or strip; and stapling devices for securing the tag individually upon the goods or material to be ticketed, or issue or deliver separate tags for subsequent use or manual application."

The specification further says: "In this regard it may be noted that the feeding mechanism is somewhat coherent to the invention herein for operating upon a particularly formed gang tag strip, and it therefore is included in the combination with the printing and severing mechanism which forms the foundation for this invention."

Defendant contends that the invention of the patent in suit resides in a particular kind of cutting mechanism, in which the cutting knife is rigidly mounted on the printer head so as to be unitarily movable therewith, in order to avoid the use of auxiliary mechanism to operate the knife; that defendant's machine does not embody this construction; that on the contrary defendant has used in its machine a prior art construction involving the very auxiliary mechanism for operating the knife which patentee sought to avoid; and that, if it is sought to expand the claims by application of the doctrine of equivalents, the claims fail to define invention over the prior art.

This contention was not, in my opinion, sustained.

In claim 1, but not in claims 2 and 3, the movable cutter member of the shearlike cutter is rigidly secured to the vertically reciprocating printing head.

In claims 2 and 3 the most that is required is a cutter unitarily movable with the reciprocating printing head.

In the defendant's machine the type holder and cutter are not rigid with respect to each other. They are unitarily combined; that is, one moves with the other.

In the defendant's machine auxiliary mechanism has been eliminated. While you might call the spring that returns the knife to its initial position auxiliary mechanism for the return, there is certainly no auxiliary mechanism on the down stroke as the cutter is moved by the printing head.

There is found in the defendant's machine "a work supporting table, capable of tracking a gang strip of pre-stapled tags divisionally apertured for partial separation in longitudinal alinement with the staple, presenting transverse abutments," and there is also a cutter "having a cutting edge equal the distance between the inner ends of the apertured portions and the opposite edge of the strip for separating each tag from its strip upon a cutting stroke of said cutter."

The defendant's device has these elements and functions associated and combined for performing identical operations and effecting identical results.

That in defendant's device the staples in the tags hang over the outside edge of the table instead of passing through a slot between the shoulder and the horizontal surface of the table, as in the patent in suit, and that the tension member which urges the gang tag strip toward the vertical shoulder for tracking the strip, is against the staple end of the tag instead of against the opposite end of the tag, as in the patent in suit, makes no difference; the same mechanism, the same functioning of apparatus, and the same results are obtained in the defendant's device as in the machine of the patent in suit.

The slightly different mounting of the defendant's movable cutting member does not relieve from infringement, as there is in such mounting no addition, subtraction, or impairment of function.

The specification shows that it is not the mounting, but the adjacency of the cutter member and the printing surface, and the organized relationship for precision and unitary coaction on the strip in relation to its step feed, that counts, where it states: "Thus a tag strip is printed upon and a subsequently printed tag severed from the strip upon each positive or forward stroke of the actuator. The adjacency of the two devices, besides their mechanical advantages, also possess economic value, in that it reduces to a minimum the number of tags between the one to be printed upon, and the one to be issued from the machine. This avoids printing an excessive number of tags over the supply required."

Both plaintiff and defendant have individual elements common to prior art devices, in very different combinations from the inventive concept of the patent in suit, but that is not controlling, as both plaintiff and defendant have each, in substantially the same way, organized these old elements into combination with a new element characteristic of the concept of the patent in suit, for a new use and service, constituting a new combination first disclosed by the patentee.

A new and useful industry and commercial practice as regards price marking has

been created by the invention of the patent in suit.

■ The patent in suit has had commercial success, and the defendant has generally followed the teaching of the patent in suit and not the teaching of the prior art, and cannot escape infringement by slight deviation from the precise relative arrangements disclosed as the patentee's preferred embodiments.

Nothing in the file wrapper history of this patent in suit requires the limited construction urged by the defendant.

Claim 2 was originally claim 5 of the patent as filed and allowed substantially as filed.

Claim 3 was allowed substantially as filed in amendment, and it differs from claim 2 in not definitely specifying the printing head.

That plaintiff's tag strips could not be fed through defendant's machines, nor defendant's tag strips through plaintiff's machines, does not seem to me to be controlling, because I have held defendant's tag strips, although showing slight differences, to be the equivalent of plaintiff's tag strips, and it naturally follows that the machine designed for feeding defendant's tag strips would not be exactly like plaintiff's machine in all respects, but the equivalent of plaintiff's machine, and that is what I find it to be.

The patent in suit is valid and infringed. ■ As to the tag feeding and printing machine patent, No. 1,327,241, plaintiff bases this suit on claim 1, which reads as follows:

"1. A machine of the character described, a support providing a table capable of tracking a gang tag strip, said table longitudinally having a shoulder extending above the plane of the table against which one edge of the tag strip engages, a carriage extending across the table and mounted to reciprocate longitudinally parallel with and over the table, said carriage having a finger pivoted to the carriage and extending forwardly between the carriage and table adapted to engage and advance the tag in one carriage stroke, and release from the tag strip in a reverse stroke, a reciprocating member movably transversely to the carriage for operating upon the tag strip, and means for reciprocating said carriage and member in timed relation."

As to this patent, defendant contends that the invention resides in two features, first, the extension of the carriage across the table in order that it may support an inking pad; and, second, the provision of a pawl lifter to cause the feed pawl to lift off the tag strip after the said pawl has retreated a full tag length in order to adapt the machine for feeding of tags of different widths; that defendant's machine does not have any carriage extending across the table to support the inking pad, nor indeed any carriage extending across the table at all; and that defendant's feed pawl does not lift off the tag strip after it has retreated a tag length, but before it begins its return stroke, and even then not for the purpose specified in plaintiff's patent, namely, to enable the feeding of different widths of tags, it having been proven and admitted by plaintiff that defendant's machine is adapted only for the feeding of a single standard width of tag; but this contention is not sustained.

A meritorious improvement on the patentee's original machine for printing, feeding, and severing the same prestapled and preslotted tag strip is represented by said patent in suit.

The improvements as disclosed by claim 1 thereof have particular reference to the work-supporting table and the strip-feeding devices.

The table is formed with a shoulder or ledge on one side, the function of which is to engage one margin of the tag strip, and thus assist in correctly positioning the tag strip on the table and guiding it through the machine.

The strip-feeding device is referred to in claim 1 as "a carriage extending across the table," and in the specifications this carriage is defined as a slide member 28 to receive the fulcrum end of the feed pawl finger 30".

Reference to the specifications shows that the word "carriage" as used in claim 1 has no technical significance, but refers to an overhanging slide member carrying the pivoted feed finger or pawl; the slide member being guided in the frame in a horizontal plane at right angles to the vertical plane or movement of the printing head.

The printing head and carriage slide member in plaintiff's device move in intercepting transverse planes, and take their motion from a main operating shaft having one cam for timing the printing head and another cam for timing the reciprocation of the slide or carriage.

There is a similar overhanging member

or block or slide member in the defendant's device, extended across a portion of the table to which the feed finger is pivoted. The slide member is guided in the frame to move in a horizontal plane over and parallel with the supporting face of the table, and the printing head of the slide member carrying the feed finger moves in transverse intercepting planes, taking their timed motion from a single operating shaft.

Plaintiff uses two cams, whereas defendant uses a cam and an eccentric to time-operate the said two elements.

The eccentric is an ordinary and obvious equivalent of a cam, for producing reciprocal motion or converting rotary into reciprocal motion.

The improvement results in a better supported, guided, and positioned tag strip, and one more uniformly, accurately, and conveniently time-operated in relation to the movements of the printing head, and, due to the rapidity of the operation of these machines in practice, smoothness of action, minimum wear, and lost motion, and accuracy and precision of registration are important factors.

Nowhere in the prior art is there shown such a table formed with a retaining wall and a slide member or carriage having a feed finger, and combined with a table for tracking a preslitted and · prestapled tag strip, and this was admitted by defendant's expert.

Claim 1 of the patent in suit reads on the defendant's device.

The inking pad is shown in the patent in suit as also mounted on the carriage which carries the feed finger, whereas in the defendant's device the inking pad is mounted on a separate device co-ordinated with the movement of the printing head, but this does not limit the claim, as the inking pad is not an element of claim 1, but is of claim 4 and other claims which call for "an inking pad upon said feeding means."

The descriptive words of the claim with reference to the carriage extending "across the table" do not mean, as contended by the defendant, completely across the table, from one side to the other.

For the functional purposes of the combination defined by the claim, it is only necessary that the carriage or slide member overhang or extend sufficiently across the table to permit the feed finger to engage an abutment formed by a tag slot somewhere in the medial portion of the tag.

Defendant uses the table with the strip engaging ledge or wall and the guided slide member carrying the feed finger, and claim 1 clearly reads upon defendant's device.

That defendant provides another arrangement for carrying and operating the inking pad does not relieve from infringement, as claim 1 was undoubtedly drawn to cover the improvement, disassociated from the mechanical support and operation of the inking pad.

In both the machine of the patents in suit and defendant's machine means are provided for lifting the finger up, but the defendant's machine does not lift it up for the purpose of feeding tags of different widths, as in the machine of the patents in suit, as defendant's machine is only capable of feeding tags of one width, but I do not find that the question of using tags of different widths is involved here.

There was invention in this patent in suit, it was meritorious, and has had commercial success.

The file wrapper history of this patent in suit shows nothing that requires the limited construction of claim 1 thereof, urged by the defendant.

Claim 1 was originally claim 5.

The words "extended across the table," and the words "over the table," were added by amendment, as were also the words "having a shoulder extending above the plane of the table against which one edge of the tag strip engages."

These amendments more clearly defined the general arrangement of elements and the operation of the feed finger and the structure of the table, but there was no reference cited which showed the combination of claim 1 as originally presented or as amended. Defendant's machine has embodied the exact elements of the claim in their general relationship and functional sense.

The claim reads on the defendant's machine, and the two machines operate with substantial identity and produce identical results.

The patent is valid and infringed.

I have no concern with what defendant's solicitors called "the atmosphere of the case." All that I think needs to be said about the late date at which the infringement started with reference to the life of the patent in suit, is that it is some evidence of general acquiescence.

With the prior art, much of which has become public property, to choose from, the

defendant has appropriated the invention of the patents in suit, and, as actions speak louder than words, it seems to me clear that defendant is convinced of the value of the plaintiff's invention, and that such silent praise is more impressive than its oral commendation of the prior art.

A decree may be entered in favor of the plaintiff against the defendant for an accounting with injunction and costs and the usual order of reference.

Submit proposed findings of fact and conclusions of law in accordance with this opinion.